143 F.Supp.2d 1218 (2001)
UNITED STATES OF AMERICA, et al., Plaintiffs,
v.
STATE OF WASHINGTON, et al., Defendants.
No. C70-9213.
United States District Court, W.D. Washington, at Seattle.
April 5, 2001.
*1219 Robert Kirk Costello, Attorney General's Office, Fish & Wildlife, Olympia, WA, for defendants.
Barbara J. Gazeley, Attorney General's Office, Department of Justice, Salem, OR, Eric J. Bloch, Attorney General's Office, Department of Justice, Portland, OR, for State of Oregon.
Richard Mayer Berley, Mark Slonim, John B. Arum, Ziontz, Chestnut, Varnell, Berley & Slonim, Seattle, WA, for Makah Indian Tribe.
Harry L. Johnsen, III, Daniel Alan Raas, Brian Kenneth Valentine, Raas, Johnsen & Stuen, PS, Bellingham, WA, for Lummi Nation.
Ruth A. Kennedy, Garvey, Schubert & Barer, Seattle, WA, Leslie G. Barnhart, Katherine K. Krueger, Quileute Natural Resources, Lapush, WA, for Quileute Tribe.
Kathryn J. Nelson, Tracey A. Thompson, Clemencia Castro-Woolery, Eisenhower & Carlson, Tacoma, WA, Phillip Evan Katzen, Kanji & Katzen, PLLC, Seattle, WA, Allen H. Sanders, Seattle, WA, for Skokomish Indian Tribe, Port Gamble S'Klallam Tribe, Lower Elwha Klallam Tribe, Jamestown S'Klallam Tribe.
John Curtright Sledd, Suquamish Tribe, Suquamish, WA, Phillip Evan Katzen, Kanji & Katzen, PLLC, Seattle, WA, Allen H. Sanders, Seattle, WA, for Suquamish Indian Tribe.
Bill Tobin, Vashon, WA, Phillip Evan Katzen, Kanji & Katzen, PLLC, Seattle, WA, Allen H. Sanders, Seattle, WA, for Nisqually Indian Tribe.
Eileen Marie Cooney, US Department of Justice, Seattle, WA, William Anthony White, US Department of Justice, Environment & Natural Resources, Washington, DC, Peter C. Monson, US Department of Justice, Environment & Natural Resources, Denver CO, Samuel D. Rauch, III, US Department of Justice, ENRD, Wildlife & Marine, Washington, DC, Vernon Peterson, US Department of Interior, Office of Regional Solicitor, Portland, OR, for USA.
Mason D. Morisset, Morisset, Schlosser, Ayer & Jozwiak, Seattle, WA, for Tulalip Tribes of WA.
Phillip Evan Katzen, Kanji & Katzen, PLLC, Seattle, WA, Allen H. Sanders, Seattle, WA, for Nooksak Indian Tribe, Stillaguamish Tribe, Upper Skagit Tribe, Sauk-Suiattle Tribe.
Kevin R. Lyon, Lyon Corporation, PS, Olympia, WA, Ronald John Whitener, Northwest Justice Project, Seattle, WA, Kelly S. Croman, Squaxin Island Legal Dept., Olympia, WA, Phillip Evan Katzen, Kanji & Katzen, PLLC, Seattle, WA, Allen H. Sanders, Seattle, WA, for Squaxin Island Tribe.
John Howard Bell, Annette Klapstein, Debra S. O'Gara, Law Office of the Puyallup Indian Tribe, Tacoma, WA, for Puyallup Tribe.
Nettie Louise Alvarez, Richard S. Ralston, Ralston & Alvarez, Seattle, WA, for Hoh Indian Tribe.
Richard Reich, Office of Reservation Attorney, Taholah, WA, for Quinault Indian Nation.
Alix Foster, Allan E. Olson, Office of the Tribal Attorney, Swinomish Indian Tribal Community, LaConner, WA, for Swinomish Indian Tribal Community.

ORDER ON SUMMARY JUDGMENT MOTIONS
ROTHSTEIN, District Judge.
THIS MATTER comes before the court on motions by the Makah Tribe (hereinafter "Makah"), the United States Secretary of Commerce (hereinafter the "Secretary"), and the State of Oregon (hereinafter "Oregon"), each seeking summary *1220 judgment on the methodology to be used in allocating the United States' share of Pacific whiting fish between Indian and non-Indian fishers. The State of Washington (hereinafter "Washington") has filed a combined response to these motions. Having now reviewed the pleadings filed in support of and in opposition to the motions, together with the relevant portions of the record, and being fully advised, the court finds and rules as follows:

I. BACKGROUND
The following facts are not in dispute: The Pacific whiting is a unitary fish stock (meaning that there are no recognized subspecies or distinct geographical subgroups) that seasonally travels the Pacific coast, ranging between Baja California and central British Columbia. Being in relatively good condition, the stock is commercially exploited by treaty and non-treaty fishers in the coastal waters of British Columbia, Washington, Oregon and California. The stock annually passes through the Makah's usual and accustomed fishing grounds in the northwestern portion of Washington state, and Makah fishers are the primary, and at times only, participants in the treaty portion of the United States' whiting fishery.
By agreement between the two nations, the United States and Canada coordinate in an attempt to assess stock abundance and set yearly limits on the allowable whiting catch. The countries attempt to allocate that allowable catch between them, and then regulate their own fisheries pursuant to those provisions. They do not always agree on an allocation, and combined harvest has, at times, exceeded the overall allowable catch agreed upon.
The United States' portion of the allowable whiting catch is managed by the Secretary pursuant to his obligation and authority to regulate fishery resources, through the National Oceanic and Atmospheric Administration (hereinafter "NOAA") and the National Marine Fisheries Service (hereinafter "NMFS"). These fisheries are subject to the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. § 1801 et seq. (hereinafter the "Magnuson Act"). The Magnuson Act empowers the Pacific Coast Fishery Management Council (hereinafter "PFMC") to study, design and recommend to the Secretary a fishery management plan (hereinafter "FMP") for each of the fisheries along the United States' western territorial waters. The whiting is subject to PFMC's Pacific Coast Groundfish Fishery Management Plan, which covers a range wide range of groundfish species. See 50 C.F.R. §§ 660.301-660.350. All FMPs must comply with the Magnuson Act's explicit National Standards, see 16 U.S.C. § 1851, as well as with all "other applicable law." See 16 U.S.C. § 1853(a). "Other applicable law" for purposes of the Magnuson Act includes treaties with Indian tribes. Parravano v. Babbitt, 70 F.3d 539, 544 (9th Cir.1995); Washington State Charterboat Ass'n v. Baldridge, 702 F.2d 820, 823 (9th Cir.1983).
Makah possesses an undisturbed right to take fish at its usual and accustomed fishing grounds pursuant to the Stevens Treaties, which have been interpreted to reserve for Indian tribes the right to up to half of the harvestable surplus whiting, while reserving the other half for non-treaty fishers, accounting for fairness concerns.[1] The harvestable surplus of whiting *1221 is defined as the total number of fish that may be taken while observing all conservation needs that prevent demonstrable harm to the stock, and treaty harvest is limited only by this conservation principle.
In years past, Makah and NMFS disagreed over the methodology for calculating the tribe's treaty share of the whiting fishery because of limitations on reliable scientific data, and because of disagreement over how the overall harvestable surplus would be defined. In 1995, NMFS proposed a whiting allocation that Makah believed violated its treaty rights, and Makah initiated this subproceeding by filing a Request For Determination in 1996 seeking, inter alia, to have NMFS' proposal declared invalid. Oregon and Washington joined the subproceeding to dispute the existence of Makah's treaty right to harvest whiting, and to argue that Makah's attempt to exercise any purported right was procedurally flawed. In November of 1996, these arguments were rejected by this court in a partial summary judgment ruling in Makah's favor, but questions over the proper allocation methodology remained unresolved.
Between 1996 and 1998, the dispute over the proper methodology for calculating Makah's treaty whiting share was resolved by Makah's agreement with NMFS on a compromise harvest allocation. In spite of these yearly compromises, NMFS and Makah were still pursuing a long-term management solution. Then, in 1999, Makah proposed a long-term management plan that defined the tribal allocation of whiting according to a variable percentage of the overall U.S. harvest in metric tons. The proposal laid out an allocation table, wherein the harvest percentage reserved for tribal fishers was to decrease as the coastwide harvest guideline increased, and would never exceed 17.5%. Recognizing that the conservation necessity principle was the only permissible limitation on tribal allocation, and that the proposed 1999 allocation would not raise conservation concerns, NMFS accepted the allocation method specified in Makah's proposed framework agreement.[2] NMFS did so again in year 2000. Finally, for the 2001 whiting fishery, NMFS agreed to a tribal allocation of 27,500 metric tons (down from previous years because the United States' allowable whiting catch was reduced to account for stock abundance), as specified in Makah's proposed allocation table.
NMFS and Makah are now in agreement that the allocation table proposed in 1999 is an acceptable and satisfactory long-term answer to the tribal allocation issue. They agree that the allocation will always be governed by the conservation necessity principle, and may in the future be adjusted accordingly. The Secretary and Makah therefore move the court for a summary judgment ruling approving the proposed 1999 allocation framework as a long-term management plan that falls within the tribes' treaty right and complies with applicable law. As further relief, Makah also asks the court to declare that the methodology originally proposed by NMFS in 1995 is unlawful.[3] Oregon opposes the motions of each, and has separately moved for summary judgment declaring the proper methodology for *1222 whiting allocation to be one of two variations on NMFS's 1995 biomass distribution proposal. All parties have had an opportunity to respond to the issues raised in these three motions.[4]
The parties agree that the court retains jurisdiction to hear disputes regarding Indian treaty fishing issues pursuant to paragraph 25 of the permanent injunction entered in United States v. Washington, 384 F.Supp. 312 (W.D.Wash.1974). The parties also agree that there are no factual disputes and that, therefore, this matter is susceptible to resolution by summary judgment.

II. DISCUSSION

A. Tribal Allocation for the Pacific Whiting Fishery

The dispute squarely presented by the motions pending before the court is over how to properly determine the portion of whiting to which tribes participating in the treaty fishery are entitled. The Secretary and Makah concur that the sliding scale approach that defines the tribal allocation as a percentage of the overall U.S. whiting quota, and imposes a 17.5% tribal harvest ceiling, is within the parties' treaty rights and obligations, and otherwise comports with applicable law.
Well settled law establishes Indian tribes' right to take fish at their usual and accustomed fishing grounds. See United States v. Washington, 873 F.Supp. 1422, 1430 (W.D.Wash.1994) (hereinafter "Shellfish I"). The tribes' right is not limited by particular species, nor limited to the species that were caught at the time of the treaties preserving the right. Id. The tribes are entitled to a fair share of fish, which has been determined to be up to 50% of the harvestable quota of fish, with an equal share going to non-tribal fishery participants. Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658, 685-87, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979); Midwater Trawlers Cooperative v. United States Dept. of Commerce, C96-1808R, Order Granting Defendants' Motion for Summary Judgment at 23 (July 26, 2000) (affirming the Secretary's approval of the 1999 whiting fishery, which implemented Makah's sliding scale allocation methodology for the first time) (hereinafter "Midwater Trawlers Order"); Shellfish I, 873 F.Supp. at 1444. The tribes and the citizens of the states thus hold the right to take fish in common, and any allocation of fish between the two groups must fairly preserve each's harvest opportunity. See Passenger Fishing Vessel Ass'n, 443 U.S. at 685, 99 S.Ct. 3055 (holding that tribes treaty right cannot be exercised to such an extent as to destroy fishing opportunities for non-Indian citizens). It is also beyond doubt that the tribes' right to take fish, thus defined, is limited only by the conservation necessity principle, according to which the ceiling on tribal harvest is the maximum number of fish that may be taken without raising concerns regarding the conservation and viability of the stock being exploited. Passenger Fishing Vessel Ass'n, 443 U.S. at 682, 99 S.Ct. 3055 (holding that "treaty fishermen are immune from all regulation save that required for conservation"). The conservation necessity principle permits only those conservation measures reasonable *1223 and necessary "to the perpetuation of a particular run or species of fish." United States v. Washington, 384 F.Supp. 312, 342 (W.D.Wash.1974). Against this legal backdrop, the tribal allocation agreed upon by NMFS and Makah appears to be wholly within the tribe's treaty right to a fair share of whiting.
Nevertheless, Oregon argues that the allocation methodology proposed by Makah and the Secretary allows inequitable and excessive tribal harvest, and contends that the tribes are entitled to some share between 5 and 10% of the U.S. harvest based on its biomass distribution method. Specifically, Oregon claims 1) that the biomass distribution model, where total tribal harvest potential is limited by the amount of whiting that may be found in usual and accustomed fishing grounds during particular survey periods, is the most equitable way to divide the fishery resource because that is the model used in international regulatory processes; 2) that associating the entire Pacific whiting run with tribal fishing, when only a portion of the stock may, in any given year, physically pass through usual and accustomed grounds, is improper; and 3) that the biological characteristics of whiting render anadromous fish precedent inapplicable and make the biomass distribution method the only appropriate method for allocating the fish. As discussed below, the court rejects each of these arguments.

1. International Reliance on Biomass Models
Although it claims that the biomass distribution model is internationally recognized as the best measure for allocating marine fishery resources, Oregon provides no support for this assertion. Indeed, the record before the court does not indicate that there is any consensus between nations on using a biomass model for the whiting fishery. Although many fisheries are subject to international agreements using biomass models, many fishery regulatory agreements have nothing to do with biomass distribution. See Myers Decl. in Opposition to Oregon's Motion for Summary Judgment at ¶¶ 9-18.
On the contrary, no particular methodology need be used in calculating tribal whiting allocation, so long as the conservation necessity principle, fairness to non-Indian fishers, the strictures of the Magnuson Act, and other applicable law are observed. In this case, the biomass distribution model is not necessary for conservation reasons or to protect the fishing opportunity of non-tribal fishers, and Oregon concedes as much. In fact, NMFS, the government agency charged with assessing the health of national fisheries resources, concluded that the proposed allocation schedule presents no threat to stock abundance or long-term health. During the notice and comment process on the sliding scale allocation used for 1999, 2000, and 2001, not one interested party (including Oregon) claimed that the proposed allocation created environmental or conservation risks.

2. Calculating Whiting Pass-through
Oregon also attempts to limit Makah's harvest opportunities to a portion of the total number of individual fish that actually enter tribal usual and accustomed fishing grounds. This attempt is similarly misguided. Calculating the amount of harvestable whiting by taking a snapshot of their geographic distribution through tribal fishing grounds at given points in time is a more complicated and more cumbersome method than treating the whiting run as a unit, and tends to produce less accurate results. The fact that whiting migration does not follow a single, coordinated geographic or temporal pattern suggests that Oregon's proposed methodology would necessarily underestimate the *1224 amount of fish available for tribal harvest. It is, therefore, unacceptable.
Moreover, there is no question that Oregon's proposed territorial fishing restriction for Indian fishers would not apply to non-Indians. That being the case, its proposal illegally discriminates against tribal fishing interests. See Makah v. Brown, C85-1606R, Order on Five Motions Relating to Treaty Halibut Fishing at 6 (W.D.Wash. Dec. 29, 1993) (hereinafter "Makah v. Brown Order").

3. Whiting Biological Characteristics
Oregon argues that biomass estimates must govern tribal whiting harvest because the species is biologically different than salmon, and that the legal decisions regarding salmon on which Makah and the Secretary rely are therefore inapposite. While it is true that whiting, a non-anadromous fish, does not return to fresh water spawning grounds like salmon do, there is little, if any, meaningful distinction between their migratory, feeding, and depth-distribution patterns. See Myers Decl. in Opposition to Oregon's Motion for Summary Judgment at ¶ 19; Joner Decl. in Opposition to Oregon's Motion for Summary Judgment at ¶¶ 5-6. Further, the harvest sharing approach agreed to by Makah and the Secretary, and approved for regulating salmon in Passenger Fishing Vessel Ass'n, has also been approved for halibut, see Makah v. Brown Order at 2, for herring, see United States v. Washington, 459 F.Supp. 1020, 1065 (W.D.Wash. 1978), and for shellfish, see United States v. Washington, 157 F.3d 630, 651-52 (9th Cir.1998) and Shellfish I at 1445. Most importantly, this court has already upheld the very allocation proposal at issue here as applied to the 1999 whiting fishery. Midwater Trawlers Order at 22. Whatever biological characteristics whiting may possess, none require that the whiting fishery be allocated according to the species' biomass distribution.

III. CONCLUSION
In sum, the allocation agreed on by the Secretary is a lawful exercise of his obligation to comply with the treaties guaranteeing Indian tribes their aboriginal right to take fish at their usual and accustomed grounds. The 1999 sliding scale proposal embodies NMFS's reasoned opinion on how to best manage the nation's fisheries resources while honoring the country's treaty commitments. Oregon has failed to persuade the court that this wisdom should be disregarded. The court, therefore, finds that the 1999 allocation proposal is within the Secretary's authority granted, and consistent with his obligations imposed, by the Magnuson Act.
For the reasons stated herein, the Secretary's motion for summary judgment is GRANTED; Makah's motion is GRANTED in part and DENIED in part; and Oregon's motion for summary judgment is DENIED. The sliding scale allocation method advocated by the Secretary and Makah shall govern the United States aspect of the Pacific whiting fishery until the Secretary finds just cause for alteration or abandonment of the plan, the parties agree to a permissible alternative, or further order issues from this court.
NOTES
[1] Other Indian tribes that have recognized rights to fish for whiting at their usual and accustomed fishing grounds are the Hoh and Quileute Tribes, and the Quinault Indian Nation. Because these tribes have not joined in these proceedings and do not, currently, seek to participate in the whiting fishery, the court need not address their various rights and entitlements.
[2] The court upheld the Secretary's 1999 allocation as consistent with the Magnuson Act, and not unlawfully arbitrary or capricious, by order dated July 26, 2000, in Midwater Trawlers Cooperative v. United States Dept. of Commerce, C96-1808R.
[3] The allocation methodology to which Makah objects was never implemented. Because the court is not prepared to rule on what methodologies may be permissible at another time and under different fishery conditions, Makah's request that the court declare NMFS's hypothetical allocation strategy unlawful is DENIED.
[4] The State of Washington has filed a unified response to the three motions, in which it essentially urges the court to rule only on the narrow tribal allocation issues central to the parties' motions. Washington argues that the court is not faced with the questions of 1) how to allocate the overall treaty share among the various tribes; or 2) how the overall United States whiting quota should be calculated. As is clear from the remainder of this order, the court expresses no opinion on the questions about which Washington is concerned.